IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

ROCKY GONZALES,

                  Petitioner,

       v.

R. KIRKLAND,

                Respondent.

Case No. CIV 07-882RJB

ORDER ON PETITION
FOR WRIT OF HABEAS
CORPUS

This matter comes before the court on petitioner's petition for writ of habeas corpus. Dkt. 1. The court has considered the relevant documents and the remainder of the file herein.

## INTRODUCTION

Petitioner is a state prisoner currently incarcerated at Pelican Bay State Prison in Crescent City, California. He filed this petition for writ of habeas corpus to challenge his 2003 Sacramento County conviction. Respondent filed an answer and relevant portions of the record. Dkt. 13 and 14. Petitioner filed a traverse. Dkt. 15. A review of the record shows that the claims do not warrant habeas relief. Accordingly, the petition should be denied and the case dismissed with prejudice.

## PROCEDURAL AND FACTUAL HISTORY

Petitioner was charged by information in Sacramento County Superior Court with murder (Count one). (Pen. Code § 187, subd. (a)). The information also alleged that petitioner committed the offense for the benefit of a criminal street gang. (Pen. Code § 186.22, subd. (b)(1)). In conjunction with the murder count, the information also alleged: that a principal intentionally discharged a firearm, causing death (Pen.

Code § 12022.53, subds.(d) & (e)(1)); that a principal intentionally discharged a firearm (Pen. Code § 12022.53, subds.(c) & (e)(1)); that a principal personally used a firearm (Pen. Code §§ 12022.5, subd. (a)(1), 12022.53, subds. (b) & (e)(1)); that a principal intentionally discharged a firearm, causing death (Pen. Code § 12022.53, subds .(b), (c), (d) & (e)(1)); and that petitioner was armed with a firearm (§ 12022, subd. (a)(1)). Count two charged petitioner with attempted murder (Pen. Code §§ 664, 187, subd. (a)) and alleged, among other charges, that petitioner committed the offense for the benefit of a criminal street gang (Pen. Code § 186.22, subd. (b)(1)). Count three charged petitioner with assault with a deadly weapon (Pen. Code § 245, subd. (a)(1)) and alleged that petitioner committed the offense for the benefit of a criminal street gang (Pen. Code § 186.22, subd. (b)(1)).

Petitioner entered pleas of not guilty and was tried together with codefendant Baca before two separate juries. The jury found petitioner guilty of second degree murder, guilty of attempted murder, and guilty of simple assault. The jury also found all the allegations in Counts one and two to be true.

The court sentenced defendant to 15 years to life on the murder count, plus 25 years to life for the section 12022.53, subdivision (d) (firearm) enhancement. The court sentenced petitioner to a determinate term of nine years for attempted murder, plus 25 years to life for the section 12022.53, subdivision (d) enhancement. The court sentenced petitioner to time served on the assault count. The total term was nine years consecutive to the indeterminate term of 65 years to life.

The California Court of Appeal summarized the facts of the case as follows:

**The Trial**

Since the focus of this appeal is the sufficiency of the evidence to support the judgment, we provide a rather detailed summary of the trial testimony.

***Lee Ward, Vanessa Pineda, and Jesus Avila***

Lee Ward, injured by gunfire in the altercation, testified about the events leading up to the shooting. Ward and Garnica worked at Garnica's family restaurant. The day of the shooting, the duo left work at around 5:00 p.m. and walked to the nearby Quik Stop Market.

Vanessa Pineda, Garnica's girlfriend and the mother of their two children, also testified and corroborated much of Ward's testimony.

The afternoon of the incident, Pineda drove to the Quik Stop. She found Garnica, accompanied by Ward and another man, Jesus Avila, standing outside the market. Avila's testimony also corroborated Pineda's and Ward's versions of events.

Garnica gave Pineda money to buy liquor at the market. As Pineda entered the store, a burgundy pickup truck pulled up next to her car. Defendant drove the truck with Baca and John Medina as passengers. As Pineda left the store, defendant made a comment to Pineda to the effect of,

"[D]amn, look at baby." FN3 (FN3: Defendant disputes that evidence at trial revealed him as the author of this comment. However, Avila identified the speaker as the driver of the truck; defendant drove the truck. Defendant contends Avila, on cross-examination, admitted he was not sure who made the comment. During cross-examination, Avila stated he was not sure who asked him "[W]hat's up." Avila did not retract his identification of defendant as the individual who made the comment to Pineda.) Medina made a statement about how pretty Pineda was. Garnica responded, "[S]hut up."

Medina and defendant approached Garnica and said, " 'What? Who's he telling to shut up?' " Garnica replied: " 'Nobody. I'm just saying that's my lady.' "

Medina then asked Garnica if he was a "scrap," a word used to describe a Sureño gang member. Garnica denied being a scrap. Ward pulled up his shirt to show Medina he was wearing a red belt. The red belt implied he was not a Sureño member. Ward wore the belt to protect himself against the Oak Park Bloods, who wore the color red.

Medina grabbed a bag with a bottle in it from Garnica and told Ward to back up. Defendant, standing next to Medina, told Garnica they did not know that Pineda was " '[his] lady.' " But defendant also cautioned Garnica, " '[B]ut you don't got to tell my homeboy to shut up.' " Medina told Garnica not to be " 'disrespecting,' " but since Garnica was not a scrap, everything was okay. Medina then handed the bottle back to Garnica. During this exchange, Baca ordered Avila not to move. Avila wanted to walk over to Garnica, but Baca warned him to stay where he was.

Ward reached for his cell phone, and Medina asked what he was grabbing. Ward told Medina he did not have a weapon. Someone, either Medina or defendant, said: " 'We'll shoot the whole fucking parking lot up.' " FN4 (FN4: Defendant claims Ward testified he could no longer remember who made the statement. To the contrary, Ward testified either defendant or Medina threatened to shoot up the parking lot.)

Pineda testified that Medina apologized to her before he left, and she saw Medina shake hands with Garnica. Avila testified defendant apologized to Garnica.

Medina, Baca, and defendant got back in the truck and drove away. FN5 (FN5: Defendant disputes any evidence supports the fact that Baca got into the truck. However, Ward clearly testified all three men-defendant, Medina, and Baca-got into the truck and drove away.) Ward told Pineda the men had shown her disrespect and were "talking shit."

Ward read off the license plate number, which Pineda wrote down. Ward testified Garnica removed a crowbar from Pineda's truck before she left. Garnica put the crowbar in his pants. Ward told Garnica he did not need it since Ward did not think there was a problem. After Pineda left, Avila drove away.

As Garnica and Ward walked down the street, they saw defendant and Medina approaching them on the other side of the street. Medina crossed the street and approached Garnica and Ward; defendant followed behind. Garnica told Ward those were the men who had confronted them at the market.

Medina walked up to Ward and punched him. Defendant fought with Garnica. Garnica fell to the ground. Ward then saw a third person approach and throw a bottle at Ward from approximately 10 feet away. This third individual was not Baca. Because Ward did not know the third person's identity, he failed to inform the police about his presence at the scene. Instead, Ward told the police the fighting involved only two men: defendant and Medina.

Ward turned and saw Medina kicking Garnica on the ground. Defendant also kicked and hit Garnica. Ward hit Medina in the face, turned around, and felt a bullet hit him on the left side. Ward did not see the person who shot him. Before the shooting occurred, the third man was out in the street.

As the wounded Ward ran across the street, he heard a second shot. He continued to run into a parking lot and heard a third shot.

### Detective John Keller

Detective John Keller interviewed Ward at the hospital the next evening. Ward testified the confrontation at the market involved three men, and the confrontation just prior to the shooting involved only defendant and Medina although a third person threw a bottle. However, Keller testified Ward was unclear about how many individuals participated in the second confrontation. Ward did not identify Baca as being at the scene and told Keller either defendant or Medina threw the bottle.

Ward described the man who threw the bottle as pudgy, Mexican, five feet six inches to five feet eight inches tall, 220 pounds, 27 or 28 years old, and wearing a tank top and long shorts with a tattoo on his chest or back. Ward testified the taller man was six feet three inches tall, Mexican, and weighed approximately 220 pounds. The third man outside the market was short and stocky, weighing 180 to 190 pounds, and muscular, with short hair, funny-colored eyes, tattoos, and wearing a tank top and long shorts. According to Keller, Ward described the third man as five feet 11 inches tall with a light-colored face.

### John Medina

John Medina, a friend of defendant and Baca, denied being a gang member. Medina admitted friendships with gang members. As a preteen, Medina wanted to be a member of the downtown Centro gang. Medina sympathized with the Centros. Medina testified he would confront anyone who disrespected a Centro.

Defendant never told Medina he belonged to a gang. However, Medina identified several photographs of defendant flashing hand signs indicating the number "14," a number associated with the Norteño gang. Medina observed defendant in the company of Norteño gang members. According to Medina, Baca was once affiliated with a Norteño prison gang and sports a gang tattoo on his chest.

Medina testified defendant came to his house the day of the murder. The pair left in defendant's truck, picking up Baca on the way to get something to drink. After arriving at the Quik Stop, the trio got out of the truck. Defendant spoke to Pineda while Medina went inside and bought beer. Medina heard arguing and defendant asking: "Who are you telling to shut up[?]"

Garnica and Medina shook hands and Garnica offered him a drink. Medina handed the bottle back because he does not drink hard liquor. Medina did not see Ward reach for a cell phone. Medina heard Ward say either "[P]op the trunk, get the gun" or "[P]op the trunk." Medina got into defendant's truck. He did not see Baca get into the truck.

Medina and defendant decided to drive to Baca's house to see if he was there. Baca lived near the market, but the pair failed to locate him. Medina and defendant decided to return to the market to look for Baca and buy more beer.

As Medina crossed the street he saw Garnica and Ward. Medina testified Ward began the fight by hitting him. Garnica jumped on top of Medina, and defendant told Garnica to get off. Defendant grabbed Ward and walked toward the street. Medina pushed Garnica off of him. Medina heard a gunshot and saw Garnica on the ground, moving around and mumbling.

Medina saw Baca approach and point a gun at Garnica's head. Medina asked Baca not to shoot, but Baca lowered the gun and it went off. Medina saw Baca fire the gun but did not believe Garnica had been wounded. Medina saw no blood.

Medina, admittedly hard of hearing, heard only two shots. Medina testified defendant left after the

first shot. Baca and Medina left after the second shot.

### The Garcia Family

Dorothy Garcia was driving her family past the Quik Stop market when three shots rang out. Garcia saw three Mexican men and one black man standing together. The black man ran across the street. A Mexican man with red spots on his shirt staggered and fell. The other two men fled.

Garcia's son and two daughters, also in the car, saw a Mexican man wearing tan pants and a white shirt lean against the fence and then fall. A black man ran across the street and fell in a nearby parking lot.

Two of the children saw three Hispanic men flee the scene; the other saw two or three men running. Garcia's daughter described the three men to an officer shortly after the shooting. One was a medium-sized male with dark hair, wearing a white T-shirt. The second man was slightly taller, with a medium build and braided hair pulled back, wearing a gray and black checked shirt and black pants. The third man was shorter than the other two, with a medium build, wearing a red T-shirt.

One of Garcia's sons also described the three men. The first was an Hispanic male, five feet 10 inches tall, weighing 250 pounds, with a goatee and wearing a white T-shirt, dark pants, and a red and black hat. The second, also Hispanic, was approximately the same height, with short brown hair, wearing a white T-shirt and black pants. The third man, also Hispanic, was about the same height and wore a white T-shirt, dark pants, and a red hat.

### Jessica Morales

Jessica Morales, Baca's former girlfriend, testified she ceased living with Baca a couple of days before the murder and attempted murder. A shooting occurred at Morales's relative's house the day before the murder. In an interview, Morales told police she believed Baca was responsible. At trial, Morales testified she did not believe Baca was responsible but previously implicated him out of anger.

In September 2001 Baca got a small black revolver. Baca kept a box of bullets for the gun on the floor next to his couch. Baca generally left the gun at home and did not carry it on his person.

The shooting took place on September 28, 2001. On October 4, 2001, Baca called Morales at her brother's house. Morales testified that Baca did not tell her his location but gave her a long-distance phone number. Morales called Baca collect from a pay phone.

At the time of the phone call, Morales knew nothing of the Garnica murder. Morales knew Baca was a suspect in the shooting at her relative's house. Baca told Morales he was in "big trouble." Baca said he wanted to say goodbye because he was going away for a long time. Morales told Detective Keller that Baca told her he was in Big Bear. Morales advised Baca to turn himself in.

Morales was unsure whether Baca belonged to a gang at the time of the murder. Morales told officers Baca was at one time a member of a Norteño gang, sporting a gang tattoo and wearing gang colors. Morales wanted to keep Baca away from his friends downtown.

Morales testified she was under the influence of marijuana when interviewed by police. She was unaware Baca had committed a crime until the police informed her.

Detective Keller searched Baca's apartment and found a live .32-caliber long bullet under the couch. The bullet bore the same caliber as the bullet removed from Garnica's body. Police arrested Baca in Big Bear.

### Gang Expert

Police Detective Ronald Aurich is a street gang expert. Among Sacramento Hispanic gangs, two predominate: the Norteños, sporting red and cleaving to the number 14, and the Sureños, sporting blue and cleaving to the number 13. "Scrap" is a derogatory term for a Sureño. The tattoo "ENE" represents "Northern structure." Norteños pursue a plethora of criminal activities, including homicides, drive-by shootings, carjackings, and robberies.

Within the Hispanic gang culture, respect holds a prominent place. Status in the gang community is paramount, and members are sensitive to both verbal and nonverbal disrespect. Telling someone to "shut up" is such an expression of disrespect. Calling an individual a scrap would provoke a reaction 99 percent of the time. Even inadvertent disrespect by a non-gang member culminates in violence.

According to Aurich, Baca and defendant both belonged to the Norteño gang. Law enforcement employs eight criteria for identifying gang members: admitting gang membership, sporting gang tattoos or colors, associating with known gang members, involvement in gang-related crimes, being named by at least two gang members as a member of their gang, appearing in photos indicating gang affiliation, jail or prison correspondence reflecting gang affiliation, and field contact by police while participating in gang-related activities. Police identify as gang members individuals who meet at least two of those criteria.

Aurich noted defendant had an "XIV" tattoo on his chest and a "14" tattoo on his forearm. Defendant associated with gang members, and photos revealed defendant displaying Norteño gang signs.

Aurich believed the original dispute in front of the Quik Stop constituted a gang confrontation that escalated. When Garnica told Medina to "shut up," he committed an act of disrespect. Such disrespect inevitably results in gang retaliation. In the gang milieu, members back up fellow gang members and unite during a confrontation. A gang member loses respect if he fails to provide backup.

The circumstances surrounding the confrontation-the "scrap" comment, the escalation into a fight, the throwing of the bottle, and the concluding gunshots-were all an effort to solidify the street existence and status of the Norteño gang. According to Aurich, if a gang member is capable of shooting or assaulting people he does not even know, the act enhances the gang member's reputation in the community. The act frightens others and prevents them from reporting crimes to the police.

In Aurich's opinion, defendant committed the crimes charged for the benefit of, at the direction of, and in association with the Norteño street gang with the intent to promote criminal conduct by the gang members.

Aurich related an earlier attempted murder under similar circumstances. A member of the Oak Park Norteño gang was at a gas station when he called another patron a "scrap." The patron denied being a gang member and the Norteño shot him repeatedly.

### Defense Case

Juan Martinez testified he lived near the market and observed a fight on the day of the shooting. Martinez believed four or five men were involved. Martinez told police he saw five or six men. One man, wearing a white shirt, was punched and kicked by two men who Martinez believed might have been black. The other man ran away. Martinez heard three or four shots.

Martinez told police that one of the men who punched the victim drew a small black gun from his waist and fired two or three shots at the victim. However, at trial Martinez testified he did not see anyone with a gun. Martinez was afraid to testify, fearing retaliation. Martinez had been drinking on the day of the shooting and felt the effects of imbibing.

*People v. Gonzales*, 2004 WL 1950315 * 1-6 (Cal.App. 3 Dist.); Dkt. 14, Lodged Document No. 4.

Petitioner filed a direct appeal with the California Court of Appeal, Third Appellate District, which affirmed his conviction on September 3, 2004. Dkt. 14, Lodged Document 4. Petitioner's petition for review was denied by the California Supreme Court on November 17, 2004. Dkt. 14, Lodged Document No. 8.

On July 22, 2005, petitioner filed a state petition for writ of habeas corpus in the Sacramento County Superior Court. Dkt. 14, Lodged Document No. 9. On August 22, 2005, the petition was denied. Dkt. 14, Lodged Document No. 10. The decision of the Superior court will be addressed below as it applies to petitioner's claims in this federal habeas corpus action. On September 27, 2005, petitioner filed a petition for writ of habeas corpus with the California Court of Appeal. Dkt. 14, Lodged Document No. 11. On October 6, 2005, the petition was denied. Dkt. 14, Lodged Document No. 12. On November 7, 2005, petitioner filed a state petition for writ of habeas corpus with the California Supreme Court. Dkt. 14, Lodged Document No. 13. On August 16, 2006, the California Supreme Court denied the petition. Dkt. 14, Lodged Document No. 14.

On December 11, 2006, petitioner filed this petition for writ of habeas corpus. Dkt. 1. The court has carefully reviewed the entire record in this case.

CLAIMS

Petitioner raises twelve claims in his petition, which are quoted as follows:

1. Petitioner's convictions for second-degree murder and attempted murder perpetrated by his co-defendant, as a natural and probable consequence of a breach of the peace in which the co-defendant was not the perpetrator, lacked evidentiary support that petitioner intended to aid his co-defendant in his ultimate non-target crimes, in violation of petitioner's federal rights to a fair trial and to due process of the laws.

2. There was insufficient evidence that petitioner's convictions of second-degree murder and attempted murder were the natural and probable consequence of any disturbing/breach of the peace.

3. There was insufficient evidence to support that petitioner's convictions for second-degree murder and attempted murder were the natural and probable consequence of petitioner's assault on the victim Garnica during the sidewalk fight.

4. There was insufficient evidence to show that petitioner knew that his co-defendant had a gun and specifically intended to assist in the commission of co-defendant's crimes of murder and attempted murder.

5. Petitioner received ineffective assistance of appellate counsel.

6. There was insufficient evidence to support the gang allegation under Penal Code § 186.22.

7.      Petitioner was denied his right to fair notice in which to defend against the crime of disturbing the peace and its use as a target offense under the theory of aiding and abetting.

8.      Trial counsel was ineffective for failing to ensure that the jury had reached a finding on "disturbing the peace" before it could be relied upon by the jury as a target offense.

9.      Trial counsel was ineffective for failing to object to the prosecution not giving petitioner fair notice and charging the target crime of disturbing the peace.

10.     Trial counsel was ineffective for failing to adequately investigate the prior convictions of a material witness for impeachment purposes.

11.     Trial counsel was ineffective for failing to impeach victim/witness Ward's testimony with his prior felony conviction for a violation of Penal Code § 246.

12.     Trial counsel was ineffective for failing to present an expert witness on gangs on behalf of the defense.

Docket 1.

## EXHAUSTION

Before claims may be raised in a federal habeas corpus petition, state remedies must be exhausted; or an applicant must show there is either an absence of available state corrective process or that circumstances exist that render such process ineffective to protect the rights of the applicant. 28 U.S.C. § 2254(b)(1); *see also, Rose v. Lundy*, 455 U.S. 509 (1982). A claim has been exhausted once it has been fairly presented to the state's highest court and the court has had the opportunity to rule on the merits of the claim. *See O'Sullivan v. Boerckel*, 119 S.Ct. 1728, 1733-34 (1999); *Picard v. Connor*, 404 U.S. 270, 275-276 (1971); *Batchelor v. Cupp*, 693 F.2d 859, 862(9th Cir. 1982), *cert. denied*, 463 U.S. 1212 (1983).

A petitioner must present the claims to the state's highest court based upon the same federal legal theory and factual basis as the claims are subsequently asserted in the habeas petition. *Hudson v. Rushen*, 686 F.2d 826, 829-830 (9th Cir. 1982), *cert denied* 461 U.S. 916 (1983); *Schiers v. California*, 333 F.2d 173, 176 (9th Cir. 1964). Specifically, a petitioner must apprise the state courts that an alleged error is not only a violation of state law, but a violation of the Constitution. *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995). Vague references to broad constitutional principles such as due process, equal protection, or a fair trial do not satisfy the exhaustion requirement. *Gray v. Netherland*, 518 U.S. 152, 162 (1996); *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999); *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999), cert. denied, 120 S.Ct. 815 (2000). A petitioner must include reference to a specific federal constitutional guarantee as well as a statement of the facts that entitle the petitioner to relief. *Gray v. Netherland*, 518

U.S., at 162-163.

A petitioner who has not exhausted state court remedies may be excluded from presenting the issues to the state's highest court when the petitioner has not complied with a state procedural rule. *Harris v. Reed*, 489 U.S. 255, 260 (1989).

When a state prisoner defaults on federal habeas claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or show that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750-751 (1991).

*Cause and Prejudice*:    To satisfy the "cause" prong of the cause and prejudice standard, petitioner must show that some objective factor external to the defense prevented him from complying with the state's procedural rule. *Coleman*, 501 U.S. at 752-753 (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  Prejudice exists if the alleged errors were of constitutional dimensions and worked to the defendant's actual and substantial disadvantage. *United States v. Frady*, 456 U.S. 152, 170 (1982). Petitioner has not shown any facts to establish that an objective factor external to the defense prevented him from complying with the state requirements for appeal or other postconviction relief.  Because petitioner has not established cause for the default, it is unnecessary to consider whether he was actually prejudiced.

*Fundamental Miscarriage of Justice*:  The court may grant the writ to correct a fundamental miscarriage of justice if petitioner can show that his conviction is the result of a constitutional violation and that he is actually innocent. *Murray*, 477 U.S. at 495-96.

<u>STANDARD OF REVIEW</u>

A federal habeas corpus petition shall not be granted with respect to any claim adjudicated on the merits in the state courts unless the adjudication either  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state courts.  28 U.S.C. §2254(d). Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court

has on a set of materially indistinguishable facts. *Williams v. Taylor*, 120 S.Ct. 1495, 1523 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Id.*

A determination of a factual issue by a state court shall be presumed correct, and the applicant has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. §2254(e)(1).

<u>DISCUSSION</u>

**1.     Insufficience Evidence (Claims 1, 2, 3, 4 and 6)**

*Claims.* Petitioner contends that there was insufficient evidence to support his convictions for second-degree murder and attempted murder.  Petitioner argues that the evidence was insufficient to establish that he intended to assist in the commission of the second degree murder and attempted murder (Claim 1); the evidence was insufficient to establish that his convictions of second-degree murder and attempted murder were the natural and probable consequence of any disturbing/breach of the peace (Claim 2); the evidence was insufficient to establish that second-degree murder and attempted murder were the natural and probable consequence of petitioner's assault on Garnica during the sidewalk fight (Claim 3); the evidence was insufficient to establish that petitioner knew that his co-defendant had a gun and specifically intended to assist in the commission of his co-defendant's crimes of murder and attempted murder (Claim 4); and the evidence was insufficient to establish the gang allegation under Penal Code § 186.22  (Claim 6).

*California Court of Appeal Decision.*  In reviewing the sufficiency of the evidence claims, the California Court of Appeal concluded as follows:

**Sufficiency of the Evidence**

***Standard of Review***

In considering a claim of insufficient evidence, we examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence. Substantial evidence encompasses evidence that is reasonable, credible, and of solid value. We evaluate the evidence to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Lewis* (2001) 25 Cal.4th 610, 642.)

***Baca's Involvement in the Target Crimes***

The People posited two theories to support defendant's liability as an aider and abettor of the

murder of Garnica and the attempted murder of Ward. Defendant either intentionally acted to aid and abet the crimes of murder and attempted murder or aided and abetted one of the enumerated target crimes and was guilty of murder and attempted murder as a "natural and probable consequence" of the target crime. The court instructed the jury on both of these theories. If sufficient evidence supports either theory, we uphold the verdict unless there is an affirmative indication in the record that the verdict did not rest on a valid ground. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)

Defendant challenges his conviction under either theory. He contends there is insufficient evidence that he aided and abetted the crimes because he did not know Baca had a gun and he did not specifically intend to assist in the commission of Baca's crimes. Defendant also contends the natural and probable consequence theory of liability does not apply because there was no proof Baca, who perpetrated the ultimate nontarget crimes, also perpetrated the specified target crimes. Since we find it dispositive, we address the latter contention first.

An aider and abettor "is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets.... [¶] It follows that a defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator. It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which ... must be found by the jury."(*People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5)

To find an aider and abettor liable for the crime of a confederate under the natural and probable consequences doctrine, the trier of fact must find that the defendant acted "with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of a predicate or target offense; (3) by act or advice aided, promoted, encouraged or instigated the commission of the target crime[; and] that (4) the defendant's confederate committed an offense other than the target crime; [fn. omitted] and (5) the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided an abetted."(*People v. Prettyman* (1996) 14 Cal.4th 248, 262 (*Prettyman*).)

Under the natural and probable consequence theory, defendant was guilty of murder and attempted murder if there was sufficient proof that he aided and abetted in disturbing the peace, assault with a firearm, or assault with a deadly weapon. The People must establish that one of those crimes was committed, that defendant aided and abetted that crime, that a coprincipal in the target crime committed the murder and attempted murder, and that the murder and attempted murder were natural and probable consequences of the commission of the target crime.

Defendant argues the natural and probable consequences theory cannot be sustained under the facts of this case because Baca, who committed the murder and attempted murder, was not a coparticipant in any of the target crimes. We disagree with defendant's analysis of the facts.

As the People point out, defendant, Baca, and Medina together participated in the fight leading to the shootings. Defendant disagrees, arguing Baca did not participate in the initial confrontation at the Quik Stop or in the later confrontation during which defendant and Medina fought with Garnica and Ward. The evidence is otherwise.

At trial, Avila described the scene outside the Quik Stop. Defendant, Baca, and Medina drove up to the market. Defendant, in a provocative manner, asked: "What's up[?]" Defendant said something to Pineda, and Garnica responded by telling him, "Shut up. She's mine." The encounter escalated as defendant and Medina approached Garnica. As Garnica attempted to quell the situation, Baca told Avila, "[Y]ou don't move." As Garnica, Medina, and defendant continued talking, Baca continued to warn Avila not to move. Avila complied.

The prosecution asked Avila: "Did [Baca] ever make any movement like he was going to swing the [beer] bottle at you?"Following several objections, Avila ultimately answered, "Yes." As the argument among Garnica, Ward, Medina, and defendant continued to escalate, Baca continued to order Avila to remain where he was. Avila acquiesced.

The record reveals that defendant, Baca, and Medina all participated in the fight that presaged the shootings. While defendant and Medina challenged Garnica and Ward, Baca kept Avila at bay and out of the fray. During this initial contact, the seeds were sown for the later, fatal meeting among the six men. Baca played an active, lethal role in the latter confrontation.

A person is guilty of disturbing the peace if he "unlawfully fights in a public place or challenges another person in a public place to fight. [¶] ... [¶] ... [or] uses offensive words in a public place which are inherently likely to provoke an immediate violent reaction."(§ 415.) The triumvirate of Medina, defendant, and Baca were principals in the target crime of disturbing the peace. The trio confronted Garnica, accused him of being a "scrap," and verbally intimidated him. Baca performed his part by insuring Avila could not come to Garnica's aid. These acts were inherently likely to cause acts of retaliation.

### Murder and Attempted Murder as a Natural and Probable Consequence

Defendant argues there was insufficient evidence that murder or attempted murder were reasonably foreseeable consequences of the target offenses. The determination of whether a crime is reasonably foreseeable is fact specific. Jurors must determine not only whether one of the target crimes was committed, but also whether a reasonable person, in light of all the *circumstances, would have expected that the charged crimes were likely to have occurred. (People* v. Mendoza (1998) 18 Cal.4th 1114, 1133.)Jurors need not unanimously agree on which target crime a defendant aided and abetted, but jurors must find the defendant aided and abetted in one of the specified crimes and that the charged crimes were natural and probable consequences of that crime. (*People v. Hickles* (1997) 56 Cal.App.4th 1183, 1194.)

As defendant points out, the Supreme Court has held that an aider and abettor can rarely, if ever, become liable for the commission of a very serious crime committed by the aider and abettor's confederate where the target offense contemplated by his aiding and abetting was trivial. (*Prettyman, supra*, 14 Cal.4th at p. 269.) Predictably, defendant attempts to portray the crimes of disturbing the peace or assault as too trivial for murder to have been a reasonably foreseeable consequence.

Defendant characterizes the initial confrontation in front of the Quik Stop as "posturing and words." Since no punches were thrown or fists clenched, defendant contends it cannot be rationally concluded that the subsequent murder and attempted murder were a natural and probable consequence. We disagree.

Defendant underplays the provocative nature of the verbal confrontation. The jury found the murder and attempted murder were offenses committed for the benefit of a criminal street gang, the Norteños.

The initial confrontation involved three identified gang members-Baca, Medina, and defendant-accosting three strangers outside a market. When told to shut up, Medina asked Garnica if he was a "scrap," a derogative term for the rival Sureño gang. Although Garnica denied gang membership, defendant and Medina continued to berate him about "disrespecting" homeboys. Medina grabbed a bottle out of Garnica's hand and warned Ward not to grab a weapon. During the altercation, Baca held Avila at bay. Medina or defendant said, "We'll shoot the whole fucking parking lot up."

Although none of the participants bore a weapon, the verbal taunting and gang ethos made further violence eminently foreseeable. When rival gangs clash, verbal taunting can escalate to shouting and shoving and eventually to violence. (*People v. Montes* (1999) 74 Cal.App.4th 1050, 1055-1056.)

Given the nature of the initial confrontation, it was both reasonable and foreseeable that the seeds had been sown for retaliation in the form of gunfire.

Defendant also contends the murder and attempted murder were not reasonably foreseeable consequences of the later assaults on Garnica and Ward. Again, we disagree.

After the six men met up again, a fight almost immediately ensued. Defendant and Medina fought with Ward and Garnica. Defendant beat and kicked Garnica as he lay on the ground. During the mayhem, Baca shot both Garnica and Ward. Based on the initial tense confrontation, fraught with an atmosphere of retaliation, the ensuing shooting was a natural and probable consequence of the latter physical altercation among the six men.

*People v. Gonzales*, 2004 WL 1950315 * 6-9 (Cal.App. 3 Dist.).

*Legal Standard.* The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which the accused is charged. *In re Winship*, 397 U.S. 358, 364 (1970). Evidence is sufficient to support a criminal conviction if the record reasonably supports a finding of guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 320 (1979). The question is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*, *citing Johnson v. Louisiana*, 406 U.S. 356, 362 (1972).

*California Criminal Law on Aider and Abetter Liability.* Under California law, a defendant is guilty for any crime he aids and abets, as well as any additional offenses that are committed by the principal if those additional offenses are a "natural and probable consequence" of the crime originally aided and abetted. *People v. Prettyman*, 14 Cal. 4th 248, 261 (1996). Accordingly, an aider and abetter "is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets." *People v. Croy*, 41 Cal. 3d 1, 12 (1985).

For liability as an aider and abetter to the original "target" offense,

the trier of fact must find that the defendant, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of a predicate or target offense; (3) by act or advice aided, promoted, encouraged or instigated the commission of the target crime.

*Prettyman*, 14 Cal.4th at 262.

For liability as an aider and abetter to a "nontarget" offense,

the trier of fact must also find that (4) the defendant's confederate committed an offense other than the target crime;[ ] and (5) the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted.

*Id.* (footnote omitted).

When a jury is instructed pursuant to both of these theories of liability as an aider and abetter, the conviction will be affirmed so long as one theory is supported by sufficient evidence, unless there is an affirmative indication in the record that the verdict did not rest on that valid ground. *Griffin v. United States*, 502 U.S. 46, 49 (1991).

*Instructions in Petitioner's Case*. Petitioner's jury was instructed on both theories of liability as an aider and abetter. Specifically, the jury was informed that petitioner may be found guilty of Garnica's murder and Ward's attempted murder if either: (1) Petitioner intentionally acted to aid and abet the murder and attempted murder, or (2) Petitioner aided and abetted one of the enumerated target offenses (disturbing the peace, assault with a firearm, assault, and assault with a deadly weapon), and the murder and attempted murder were "natural and probable consequences" of that target offense. (Dkt. 14, Lodged Document No. 15, at 694-95.)   The enumerated target offense of disturbing the peace (Cal. Pen. Code § 415) was further defined, pursuant to CALJIC No. 16.260, as any person who either (1) "unlawfully fought another person, or challenged another person to fight" in a public place, or (2) "used offensive words which were inherently likely to provoke an immediate violent reaction" in a public place. (Dkt. 14, Lodged Document No. 15, 697).

*Claim 1*. Petitioner contends that the evidence was insufficient to establish that he intended to assist in the commission of the second degree murder and attempted murder.  The California Court of Appeal found sufficient evidence to support petitioner's murder and attempted murder conviction under the theory that these crimes were a "natural and probable consequence" of disturbing the peace, so the court concluded it was unnecessary to consider whether sufficient evidence supported the convictions under the theory that petitioner acted as an aider and abetter to the target offenses of murder and attempted murder.  When a jury is instructed pursuant to both theories of aider and abetter liability, the conviction will be affirmed so long as one theory is supported by sufficient evidence, unless there is an affirmative indication in the record that the verdict did not rest on that valid grounds.  *Griffin v. United States*, 502 U.S. 46, 49 (1991).

Even though the California Court of Appeal did not address this claim, the record shows that there was sufficient evidence to support petitioner's conviction as an aider and abetter of the target offenses of murder and attempted murder.  Petitioner, Baca, and Medina engaged in a hostile confrontation with Garnica, Ward, and Avila, in the Quik Stop parking lot, after Garnica told petitioner to "shut up."  Dkt. 14,

Lodged Document No. 16, at 252-254, 411-17. Petitioner, Baca, and Medina were affiliated with the Noreno gang; and, during the Quik Stop parking lot confrontation, Medina called Garnica a "scrap," which is a derogatory term for the Sureno gang. Dkt. 14, Lodged Document No. 16, at 413, 416, 432, 567, 766). Either petitioner or Medina said he would "shoot the whole fucking parking lot up" when Ward reached for his cell phone. Dkt. 14, Lodged Document No. 16, at 433-34. Petitioner, Baca, and Medina left the Quik Stop together in petitioner's truck and parked near Baca's apartment. Dkt. 14, Lodged Document no. 16, at 216-17, 220, 417, 458-62, 479-80, 611-12, 615. Baca owned a handgun. Dkt. 14, Lodged Document No. 16, at 136-37. A few minutes after petitioner's truck left the Quik Stop, Garnica and Ward were walking together away from the Quik Stop when petitioner and Medina appeared from a nearby doorway, crossed the street to confront Garnica and Ward, and then initiated a physical fight with Garnica and Ward. Dkt. 14, Lodged Document No. 16, at 421-25, 490, 514-19. Mr. Garnica remarked that those were "the same guys that was just at Quick [sic] Stop." Dkt. 14, Lodged Document No. 16, at 422. Within seconds of the fight starting, Baca appeared, and fatally shot Garnica and injured Ward. Dkt. 14, Lodged Document No. 16, at 429-30, 488, 624-27. Petitioner, Baca, and Medina ran together from the scene of the shooting. Dkt. 14, Lodged Document No. 16, at 327-29, 378.

Petitioner contends that "[n]o conspiracy was charged or proved. Nor did the prosecution charge or prove any agreement between petitioner and Medina to shoot Garnica and Ward after the Quick Stop Market confrontation." Dkt. 1, at 7. However, viewing the evidence in the light most favorable to the prosecution, a reasonable trier of fact could draw inferences that petitioner or Medina threatened to shoot up the Quik Stop parking lot shortly before Garnica and Ward were shot by Baca; that petitioner knew Baca intended to shoot Garnica and Ward; that petitioner intended to assist Baca by driving Baca to his home next to Gunthers so that Baca could get his gun; that petitioner then initiated a fistfight with Garnica until Baca could return with the loaded gun; and that petitioner, Baca, and Medina fled the scene together after the shooting. Accordingly, the evidence is sufficient to support petitioner's conviction that he aided and abetted the murder and attempted murder.

Petitioner's claim that the evidence was insufficient to convict him of aiding and abetting the murder and the attempted murder is without merit. The California state court decisions upholding petitioner's convictions were not contrary to or an unreasonable application of clearly established federal law, as determined by the Supreme Court, nor did they result in a decision that was based on an

1 unreasonable determination of the facts in light of the evidence presented to the state courts.

2 *Claim 2.* Petitioner claims that the evidence was insufficient to establish that his convictions of

3 second-degree murder and attempted murder were the natural and probable consequence of any

4 disturbing/breach of the peace.

5 The California Court of Appeal upheld petitioner's convictions of murder and attempted murder on

6 an aiding and abetting theory, with disturbing the peace (Pen. Code § 415) as the target offense. Pen.Code

7 § 415 provides as follows:

8 Part 1, Title 11. Of Crimes Against the Public Peace

9 § 415. Fighting; noise; offensive words

10 Any of the following persons shall be punished by imprisonment in the county jail for a period of
not more than 90 days, a fine of not more than four hundred dollars ($400), or both such
11 imprisonment and fine:

12 (1) Any person who unlawfully fights in a public place or challenges another person in a public
place to fight.

13
(2) Any person who maliciously and willfully disturbs another person by loud and unreasonable
14 noise.

15 (3) Any person who uses offensive words in a public place which are inherently likely to
provoke an immediate violent reaction.
16

17 The record supports the facts as set forth by the Court of Appeal. The reasonable inferences from

18 the evidence, when construed in favor of the prosecution, show that petitioner and Medina engaged in a

19 verbal confrontation with Garnica and Ward in the Quik Stop parking lot; that the confrontation escalated;

20 and that petitioner, Medina, and Baca left in petitioner's truck. Petitioner argues that the exchange ended

21 with an apology from Medina and a handshake with Garnica; and that the men parted without incident.

22 Petitioner further contends that Baca stayed in the background and did not get involved in the

23 confrontation. However, Avila testified that Baca positioned himself next to Avila and kept telling Avila

24 not to move; that Baca jerked a bottle of beer in his hand towards Avila in such a manner that Avila

25 thought he would be struck; and that Baca did not move away from Avila until petitioner and Medina had

26 left Garnica and Ward and stepped back inside petitioner's truck. Dkt. 14, Lodged Document 16, at 257-

27 60.

28 Much of the evidence presented in this case was conflicting and disputed. Petitioner relies on

evidence that supports his claim, specifically that any hard feelings were resolved when there was an

apology and handshake between Garnica and Medina. However, as set forth in the Court of Appeal decision, there was sufficient evidence to support a reasonable inference that the Quik Stop parking lot confrontation was escalating and volatile. The evidence shows that petitioner, Medina, and Baca were involved in a confrontation with Garnica, who had told petitioner to "shut up;" that Medina asked Garnica if he was a "scrap," that petitioner and Medina continued to berate him about disrespecting homeboys; that Medina grabbed a bottle out of Garnica's hand and warned Ward not to grab a weapon; that Baca held Avila at bay; and that Medina or petitioner said, "We'll shoot the whole fucking parking lot up." The verbal confrontation involved offensive words, in a public place. The conflict between the Norenos and Surenos, as testified to by Detective Ronald Aurich, an expert on Sacramento gangs, added to the likelihood that an immediate violent reaction would occur. The record is sufficient to establish that petitioner committed the crime of disturbing the peace (*See* Pen.Code.§ 415 (use of offensive words in a public place which are inherently likely to provoke an immediate violent reaction); that the provocative nature of the verbal confrontation in the Quik Stop parking lot, the verbal taunting, and the gang ethos made further violence foreseeable; and that the murder and attempted murder were the natural and probable consequence of disturbing the peace.

The California state court decisions rejecting petitioner's claim that there was insufficient evidence to establish either the elements of the target offense of disturbing the peace or that the murder and attempted murder were the natural probable consequence of the disturbance of the peace were not contrary to or an unreasonable application of clearly established federal law, as determined by the Supreme Court, nor did they result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. This claim is without merit.

*Claim 3.* Petitioner claims that the evidence was insufficient to establish that the murder and attempted murder were the natural and probable consequence of petitioner's assault on Garnica during the sidewalk fight. Petitioner argues that there is no evidence that petitioner and Baca had any plan to shoot Garnica or Ward, or that they were otherwise acting in concert; no evidence that petitioner actively encouraged Baca to shoot; and, in fact, Ward testified that petitioner had left before the first shot was fired. The California Court of Appeal did not address this theory of liability, because that court concluded there was sufficient evidence to support the convictions on another theory.

The record shows that there was sufficient evidence to establish that petitioner assaulted Garnica

during the sidewalk fight.  Dkt. 14, Lodged Document No.16, at 423, 510. The escalating verbal

confrontation occurred at the Quik Stop parking lot. The verbal confrontations included gang related

issues and language.  Petitioner, Medina, and Baca left the Quik Stop in petitioner's truck; petitioner and

Medina engaged in a physical altercation with Garnica and Ward at the scene of the shooting. Baca arrived

at the scene with a gun shortly after petitioner and Ward confronted Garnica and Ward.  A reasonable jury

could have drawn the inference that petitioner and Medina started a fight with Garnica and Ward, waiting

for Baca to show up with the gun.  A reasonable jury could have drawn the inference that petitioner and

Ward knew Baca owned a gun, and that a physical fight between them and Garnica and Ward would lead

to further violence, specifically that Baca would enter into the fray with a gun. Accordingly, there was

sufficient evidence for a reasonable jury to draw inferences from the evidence that the shooting of Garnica

and Ward by Baca was a natural and probable consequence of the assault.

The California Court of Appeal decision rejecting petitioner's claim that there was insufficient

evidence to establish that the murder and attempted murder were the natural and probable consequence of

the crime of assault were not contrary to or an unreasonable application of clearly established federal law,

as determined by the Supreme Court, nor did they result in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented to the state courts. This claim is without merit.

*Claim 4.*  Petitioner contends that the evidence was insufficient to establish that he knew that his

co-defendant had a gun and specifically intended to assist in the commission of co-defendant's crimes of

murder and attempted murder.  To the extent that petitioner claims that his aider and abetter liability was

based on murder and attempted murder as the target offense, the court has analyzed this issue above with

regard to Claim 1.  To the extent that petitioner claims that his aider and abetter liability was based upon

the target offense of disturbing the peace, the court has analyzed this issue above with regard to Claim 2.

To the extent that petitioner claims that his aider and abetter liability was based upon the target offense of

assault, the court has analyzed this issue above with regard to Claim 3.  Accordingly, this claim has been

thoroughly analyzed and is without merit.

The California state court decisions rejecting petitioner's sufficiency of the evidence claims based

upon aider and abetter liability were not contrary to or an unreasonable application of clearly established

federal law, as determined by the Supreme Court, nor did they result in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented to the state courts. This claim is

1   without merit.

2       *Claim 6.* Petitioner contends that the evidence was insufficient to establish the gang allegation

3   under Pen. Code § 186.22 . Petitioner argues that there was no evidence presented at trial to establish that

4   he had formed the intent to promote, further, or assist in any criminal conduct for the benefit of a street

5   gang in aiding Baca to commit the crimes.

6       Petitioner presented this claim in his habeas corpus petition in the Sacramento County Superior

7   Court.  In rejecting the claim, the court concluded as follows:

8       Claims that could have been raised [on] appeal are not cognizable on habeas corpus unless the
        petitioner can show that (1) clear and fundamental constitutional error strikes at the heart of the
9       trial process; (2) the court lacked fundamental jurisdiction; (3) the court acted in excess of
        jurisdiction not requiring a redetermination of facts; or (4) a change in law after the appeal affected
10      the petitioner.  (In re Dixon (1952) 41 Cal.2d 756, 759; In re Harris (1993 5 Cal.4th 813, 828.)

11      Petitioner claims that there was insufficient evidence to support the gang enhancement.  Claims of
        insufficient evidence normally may and must be raised on appeal.  Petitioner's appeal did not raise
12      this claim, which is barred on habeas corpus.  Petitioner's only explanation for not raising the claim
        on appeal is that appellate counsel refused to do so.  This bare assertion is not sufficient to justify
13      not raising the claim.  Therefore, the failure to raise the claim on appeal is not excused.

14  Dkt. 14, Lodged Document 10, at 2.  The California Court of Appeal and the California Supreme Court

15  denied review.

16      Respondent contends that, after the decision in *In re Robbins*, 18 Cal.4th 770 (1998), application

17  of the procedural bar under *In re Dixon, supra*, constitutes an independent and adequate grounds upon

18  which to base a procedural bar.  In *Protsman v. Pliler*, 318 F.Supp. 2d 1004, 1007-09 (S.D. Cal. 2004),

19  the district court analyzed the history of the application of the procedural bar, and determined that the

20  current application of the procedural bar under *In re Dixon* is now–and at the time of the Sacramento

21  Superior Court's decision denying petitioner's habeas petition–based on independent and adequate

22  grounds.  The court concurs with the thorough analysis of the district court in *Protsman v. Pliler.*

23  Petitioner failed to exhaust the claim that there was insufficient evidence to support the gun enhancement.

24      Moreover, even though this claim is procedurally barred because it was not exhausted, the court

25  has reviewed this claim on the merits.  *See* 28 U.S.C. § 2254(b)(2)(An application for a writ of habeas

26  corpus may be denied on the  merits, notwithstanding the failure of the applicant to exhaust the remedies

27  available in state courts).

28      The jury in petitioner's trial found that he had committed the underlying substantive offenses for

    the benefit of a street gang within the meaning of Pen. Code § 186.22(b)(1). *See* Dkt. 14, Lodged

Document No. 15, at 770-71. This enhancement applies to any felony that is committed (1) "for the benefit of, at the direction of, or in association with any criminal street gang" and (2) "with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." Pen. Code §186.22(b)(1). A "criminal street gang" is defined as any ongoing organization whose primary activities include the commission of one or more statutorily enumerated criminal acts (including assault or unlawful homicide), and which is identified by a designated common name or symbol, and whose members individually or collectively engage in a pattern of criminal gang activity. Pen. Code § 186.22(f). A "pattern of criminal gang activity" is defined as the commission of any statutorily enumerated crime (such as assault or unlawful homicide) by at least two persons on separate occasions but within three years of each other. *Id*. The charged crime may serve as one of these two predicate offenses establishing a pattern of criminal gang activity. *People v. Gardeley*, 14 Cal. 4th 605, 625 (1996).

In petitioner's case, the record shows sufficient evidence to establish the elements for the gang enhancement under Pen. Code § 186.22(b)(1). A gang allegation may be proven with expert testimony about criminal street gangs. *People v. Romero*, 140 Cal. App. 4th 15, 18 (2006).

Detective Ronald Aurich, an expert in Sacramento gangs, testified about the existence of two "primary Hispanic" rival gangs: the Nortenos, who originate from north of Bakersfield and claim the color red and the number 14; and the Surenos, who originate from southern California or Mexico and claim the color blue and the number 13. Dkt. 14, Lodged Document No.16, at 765-66. Detective Aurich testified to the following: There are thousands of Nortenos in the Sacramento area. Dkt. 14, Lodged Document No. 16, at 767. The Nortenos' primary criminal activities include homicides, assaults, robberies, and "just basic elements of violence." Dkt. 14, Lodged Document No. 16, at 767. Nortenos commonly use the derogatory term "Scrap" when referring to Surenos. Dkt. 14, Lodged Document No. 16, at 766. In all gangs, respect is a major issue and is a form of status within the gang community. Dkt. 14, Lodged Document No. 16, at 764. Consequently, "gang members do not like to get disrespected or abused in a way or challenged in a way that doesn't go unanswered." Dkt. 14, Lodged Document No. 16, at 764. Whenever a gang member is disrespected, "[n]inety-nine percent of the time they retaliate," either physically or verbally, "and it escalates to more violence." Dkt. 14, Lodged Document No. 16, at 771. Telling a gang member to "shut up" is a verbal form of disrespect, even if the speaker is not a member of any gang, and even if the slight was inadvertent. Dkt. 14, Lodged Document No. 16, at 765, 772.

According to gang culture, whenever one member is involved in a conflict, all other members are supposed to "unite" and back up each other, and any member who fails to do so will suffer repercussions. Dkt. 14, Lodged Document No. 16, at 774-75. Detective Aurich testified that murdering, or attempting to murder, a previously-unknown person for failing to show respect to a Norteno member, with the assistance of two fellow Nortenos, ultimately benefits all Nortenos by enhancing their reputation as a violent organization, which, in turn, causes the public to become more fearful and less inclined to report any criminal offenses committed by other Nortenos. Dkt. 14, Lodged Document No. 16, at 779-80.

Detective Aurich testified that both Baca and Petitioner were Norentos, as evidenced by their multiple tattoos with the Roman numeral 14, as well as several photographs in which petitioner was wearing the color red and signing the number 14 with his fingers. Dkt. 14, Lodged Document No. 16, at 768-70. Detective Aurich also testified that Medina was associated with a sub-set of the Norteno gang, known as Centro. Dkt. 14, Lodged Document No. 16, at 770. Detective Aurich opined that Garnica's murder and Ward's attempted murder were committed for the benefit of, at the direction of, or in association with the Norteno gang, and with the specific intent to promote, further, or assist in criminal conduct by Norteno gang members. Dkt. 14, Lodged Document No. 16, at 779-80. Further, the record shows that Medina had accused Garnica of being a "scrap". Dkt. 14, Lodged Document No. 16, at 256, 258, 413, 432. Petitioner and Medina had both warned Garnica to show more respect. Dkt. 14, Lodged Document No. 16, at 414-16, 499.

In addition, the trier of fact could infer that petitioner specifically intended to assist his fellow Nortenos to commit the underlying offenses in this case of murder, attempted murder, and assault. This inference applies under either theory of liability for aiding and abetter as detailed above (petitioner specifically intended to assist Baca commit murder and attempted murder, or petitioner specifically intended to assist Baca and Medina commit a disturbance of the peace that naturally and probably resulted in murder and attempted murder). See *People v. Villalobos*, 145 Cal. App.4th 310, 322 (2006) (explaining that the "[c]ommission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime"); *People v. Romero*, 140 Cal. App. 4th 15, 20 (2006) (finding "ample" evidence of specific intent where defendant "intended to commit a crime, . . . intended to help [his co-defendant] commit a crime, and . . . knew [his co-defendant] was a member of his gang.").

Petitioner points to evidence supporting his claim that the events occurred for reasons other than gang activity. The record shows conflicting evidence, much of which depended on credibility of witnesses. Nonetheless, there was sufficient evidence in the record, when reasonable inferences are taken in favor of the prosecution, to establish that petitioner committed the underlying offenses of murder, attempted murder, and assault, all in association with the Norteno gang, and that he did so with the intent to assist his fellow Nortenos to commit criminal conduct.

Petitioner's claim that there was insufficient evidence to support the gang enhancement is without merit. The California state court decisions upholding petitioner's conviction were not contrary to or an unreasonable application of clearly established federal law, as determined by the Supreme Court, nor did they result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state courts.

**2. Notice of the Disturbing the Peace as Target Offense (Claim 7)**

Petitioner claims that he was denied his right to fair notice in which to defend against the crime of disturbing the peace and its use as a target offense under the theory of aiding and abetting. Petitioner raised this issue in his habeas corpus petition before the Sacramento County Superior Court, which denied the petition, concluding, with regard to this claim, as follows:

> A petitioner seeking relief by way of habeas corpus has the burden of stating a prima facie case entitling him to relief. (In re Bower (1985) 38 Ca.3d 865, 872.) A petition for writ of habeas corpus should attach as exhibits all reasonably available documentary evidence or affidavits supporting the claim. (People v. Duvall (1995) 9 Cal.4th 464, 474.) An accusatory pleading charging a defendant with murder does not need to identify the theory on which the prosecution intends to rely. (People v. Diaz (1992) 3 Cal.4th 95, 557.) Generally, the accused will receive adequate notice of the prosecution's theory of the case from the testimony presented at the preliminary hearing. (Id.)

Dkt. 14, Lodged Document No. 10, at 2.

The Sixth Amendment guarantees that an accused "shall...be informed of the nature and cause of the accusation...." U.S. Const. ament. VI.

> No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal.

*Cole v. Arkansas*, 333 U.S. 196, 201 (1948). *See also In re Oliver*, 333 U.S. 257, 273 (1948) ("A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense–a right to his day in court–are basic in our system of jurisprudence.").

The amended complaint in this matter charged petitioner with malice aforethought murder, in violation of Pen.Code § 187(a). Dkt. 14, Lodged Document No. 15, at 130. Petitioner was convicted of second-degree murder, a violation of Penal Code § 187(a)), as a lesser included offense to premeditated, first-degree murder. The information also charged petitioner with a "malice aforethought attempt to murder" in "violation of Section 664/187(a) of the Penal Code of the State of California" (Dkt. 14, Lodged Document No. 15, at 131), and he was found guilty of that offense. Petitioner has not relied upon any decision of the United States Supreme Court that requires notice in the charging document of the state's theory upon which the charge of murder is based. Further, petitioner had notice before and throughout the proceedings that the prosecution was relying on disturbing the peace as the target offense for aider and abetter liability. At the close of the preliminary hearing, in response to petitioner's counsel's challenge to the sufficiency of evidence connecting petitioner to the murder, the prosecutor responded as follows:

> Your honor, this is a gang case that—three people are together at the Quick Stop market. They are together. One has a bottle. One has a gun. The concept of backing up one's partner—the fact that this what these gangs do—of course it's—it's reasonable and foreseeable that this is going to escalate into a shooting. I mean that is the way gangs are all about.

Dkt. 14, Lodged Document No. 15, at 276.

Further, at the conclusion of the defense cases of petitioner and Mr. Baca, counsel met in chambers to discuss the proposed jury instructions. Dkt. 14, Lodged Document No. 15, at 635. The next morning, the parties again discussed the jury instructions. Dkt. 14, Lodged Document No. 15, at 636. Petitioner's counsel noted his objection to disturbing the peace as a target offense. Dkt. 14, Lodged Document No. 15, at 883. Petitioner's counsel argued that disturbing the peace is not an inherently dangerous misdemeanor, and that the language of the instruction which indicated that the homicide was a natural and probable consequence of disturbing the peace was overbroad. Dkt. 14, Lodged Document No. 15, at 883-84. Petitioner's counsel did not argue that he had received inadequate notice that disturbing the peace was the target offense for the murder charge. The jury received an instruction (CALJIC No. 3.02) that listed disturbing the peace as one of the possible offenses for aider and abetter liability. Dkt. 14, Lodged Document No. 16, at 913-15. In closing argument, both the prosecutor and petitioner's counsel argued their theories of the case as they related to disturbing the peace as the target offense for aider and abetter liability. Dkt. 14, Document No. 16, at 966-69; 1069-70.

Petitioner's counsel knew before trial the prosecution's theory that the murder and attempted

murder followed from the initial confrontation between petitioner, Medina, and Baca; and Garnica and Ward, at the Quik Stop. Petitioner's counsel argued about the aider and abetter liability based upon disturbing the peace during discussion of jury instructions and in closing argument. Petitioner has not shown that he was provided inadequate notice of the charges.

The California state court decisions rejecting petitioner's claim that he was denied his right to fair notice in which to defend against the crime of disturbing the peace and its use as a target offense under the theory of aiding and abetting were not contrary to or an unreasonable application of clearly established federal law, as determined by the Supreme Court, nor did they result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. This claim is without merit.

### 3. Ineffective Assistance of Trial Counsel (Claims 8, 9, 10, 11 and 12)

Petitioner contends that his trial counsel was ineffective for failing to ensure that the jury had reached a finding on "disturbing the peace" before it could be relied upon by the jury as a target offense (Claim 8); for failing to object to the prosecution's failure to give petitioner fair notice of the target crime of disturbing the peace (Claim 9); for failing to adequately investigate the prior convictions of a material witness for impeachment purposes (Claim 10); for failing to impeach victim/witness Ward's testimony with his prior felony conviction for a violation of Penal Code § 246 (Claim 11); and for failing to present an expert witness on gangs on behalf of the defense (Claim 12).

In order to establish ineffective assistance of counsel, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficient performance affected the result of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. In order to demonstrate prejudice, the defendant must show there is a reasonable probability that but for counsel's unprofessional errors, the result would have been different. *Strickland*, 466 U.S. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Under the first prong of the *Strickland* test, the question is whether counsel's assistance was reasonable under the totality of the circumstances, viewed as of the time of counsel's conduct. *Strickland*, 466 U.S. at 690. To succeed under the first prong, the petitioner must show the attorney's conduct

reflects a failure to exercise the skill, judgment, or diligence of a reasonably competent attorney. *United States v. Vincent*, 758 F.2d 379, 381 (9th Cir.), *cert. denied*, 474 U.S. 838 (1985).

Under the second prong, the petitioner must demonstrate prejudice; that but for counsel's unprofessional errors, the result would have been different. *Strickland*, 566 U.S. at 694. However, sheer outcome determination is not sufficient to make out a Sixth Amendment violation; a proper prejudice inquiry focuses on whether counsel's errors or omissions rendered the proceeding fundamentally unfair or the result unreliable. *Lockhart v. Fretwell*, 113 S.C. 838, 842-44 (1993).

*Claim 8*. Petitioner contends that his trial counsel was deficient because he failed to ensure that the jury had reached a finding on disturbing the peace before it could be relied upon by the jury as a target offense.

Petitioner raised this claim in his habeas corpus petition to the Sacramento County Superior Court. The court denied the petition but did not explicitly address the issue. The appellate courts denied review. Accordingly, petitioner exhausted this claim and it will be reviewed on the merits.

Ordinarily, issues regarding jury instructions present questions of state law only and are, therefore, not susceptible of federal habeas corpus review. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). A faulty jury instruction requires habeas relief only if the instruction by itself so infected the entire trial that the resulting conviction violates due process. *Estelle v. McGuire*, 502 U.S. at 72; *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). The instruction must be considered in the context of the instructions as a whole and the trial record. *Estelle v. McGuire*, 502 U.S. at 72; *Boyde v. California*, 494 U.S. 370, 378 (1990); *Cupp v. Naughton*, 414 U.S. 141, 147 (1973). The federal habeas court must determine whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution. *Estelle v. McGuire*, 502 U.S. at 63 (quoting *Boyde v. California*, 494 U.S. at 380).

In this case, the jury was instructed with CALJIC No. 3.02. The instruction provided in relevant part as follows:

> In order to find the defendant guilty of the crimes of murder . . . or attempted murder. . . , you must be satisfied beyond a reasonable doubt that one of the crimes listed below was committed: [¶] 1. Disturbing the peace, assault with a firearm, assault and assault with a deadly or dangerous weapon . . . .
>
> ****************************
>
> You are not required to unanimously agree as to which originally contemplated crime the defendant aided and abetted, so long as you are satisfied beyond a reasonable doubt and unanimously agree

that the defendant aided and abetted the commission of an identified and defined target crime . . . .
Dkt. 14, Lodged Document No. 15, at 694.  The jury was also instructed with CALJIC No. 16.260, which
defined the offense of disturbing the peace and clearly identified the requisite elements; with CALJIC No.
16.261, which elaborated upon the meaning of certain terms for this offense; and with CALJIC
No. 16.262, which explained that specific intent to provoke violence was unnecessary. Dkt. 14, Lodged
Document No. 15, at  697-99.

Considered in the context of the instructions as a whole and the trial record, petitioner has not
shown that there is a reasonable likelihood that the jury applied the instructions in a way that violates the
Constitution.  Accordingly, petitioner's trial counsel's failure to request additional instructions was neither
deficient nor prejudicial.  See *United States v. Bosch*, 914 F.2d 1239, 1248 (9th Cir. 1990) (additional
instruction would have been duplicative and, therefore, trial counsel did not unreasonably fail to
request such an instruction).

The California state court decisions upholding petitioner's conviction, after he raised this issue in
his state habeas corpus proceedings, were not contrary to or an unreasonable application of clearly
established federal law, as determined by the Supreme Court, nor did they result in a decision that was
based on an unreasonable determination of the facts in light of the evidence presented to the state courts.
This claim is without merit.

*Claim 9*. Petitioner claims that his trial counsel was deficient for failing to object to the
prosecution's failure to give petitioner fair notice of the target crime of disturbing the peace.

The court has discussed the merits of this claim above and has determined that the claim is without
merit.  Accordingly, petitioner has not shown that his trial counsel's failure to object to the prosecution's
failure to give petitioner fair notice of the target crime of disturbing the peace fell below an objective
standard of reasonableness and that any deficient performance affected the result of the proceeding.

The California state court decisions upholding petitioner's convictions were not contrary to or an
unreasonable application of clearly established federal law, as determined by the Supreme Court, nor did
they result in a decision that was based on an unreasonable determination of the facts in light of the
evidence presented to the state courts.  This claim is without merit.

*Claim 10*.  Petitioner contends that his trial counsel was deficient for failing to adequately
investigate the prior convictions of a Lee Ward, a material witness, for impeachment purposes.

In rejecting this claim in petitioner's state habeas proceeding, the Sacramento County Superior Court concluded as follows:

> A petition alleging ineffective assistance of counsel based on the failure to obtain favorable evidence must show what evidence should or could have been obtained and what effect it would have had. (People v. Geddes (1991 1 Cal.App.4th 448, 454.)
>
> Petitioner claims that counsel failed to investigate the prior conviction of witness and victim Lee Ward and failed to impeach Ward with the prior conviction. According to Petitioner, Ward had been convicted of a violation of Penal Code section 246, which is a crime of moral turpitude. It appears that Ward was not actually impeached with any prior convictions as the associated jury instruction (CALJIC No. 2.23) was not given. However, Petitioner has not attached any evidence to show that Ward in fact was convicted or could have been impeached. Petitioner's declaration that he was present when the prosecutor stated that Ward had been convicted of a violation of Penal Code section 246 is inadmissible hearsay. Although Petitioner refers to pages in the trial transcript, he has not attached them to the petition. Therefore, he has failed to support his petition with reasonably available evidence.

Dkt. 14, Lodged Document No. 10, at 3.

In the answer, respondent thoroughly and accurately summarized the proceedings relevant to this issue, and cited to the record. Accordingly, the court quotes from respondent's brief: (RT refers to Reporter's Transcript, at Dkt. 14, Lodged Document No. 16; CT refers to Clerk's Transcript, at Dkt. 14, Lodged Document No. 15).

> By mutual agreement, no court sessions was conducted over the winter holidays from December 23, 2002, through January 5, 2004. (RT at 16-17.) Then, on Monday morning of January 6, 2003, Petitioner's counsel, James Warden, moved to exclude victim Ward's testimony or, alternatively, obtain a continuance so that he could investigate Mr. Ward's criminal history that appeared in a "new" rap sheet provided by the prosecution on December 30, 2002. (RT at 88-89.) Attorney Warden noted that Mr. Ward's rap sheet listed the following arrests and convictions: (1) a 1989 misdemeanor petty theft conviction; (2) a 1996 felony conviction for shooting an inhabited house; (3) a 1996 fugitive arrest warrant from Minnesota; (4) a 1994 arrest for grand theft person; (5) a 1998 misdemeanor conviction for vandalism; and (6) a 2002 dismissed charge for assault with a deadly weapon in Sacramento County. (RT at 88-89.)
>
> The prosecutor responded, "In regards to the rap sheets, why he does not have all the information, I don't know. As a matter of course, whenever—before a case starts, I always update my rap sheets and provide them to the defense attorney." (RT at 90.) Thus, as even attorney Warden acknowledged, he had received two rap sheets from the prosecutor for Mr. Ward, the most recent one having been provided one week before Petitioner's trial was scheduled to commence. (RT at 89-90.) The prosecutor asserted that no police reports were needed to impeach Mr. Ward with his prior felony conviction, that the misdemeanor vandalism conviction was inappropriate for impeachment because it did not involve moral turpitude, and that the petty theft misdemeanor conviction was too remote to be admissible. (RT at 90.) The prosecutor also stated that he had no information about the Minnesota warrant and that he did not know how long it would take to obtain a copy of the older police reports. (RT at 90.) The prosecutor further stated that he was unaware of any deal to Mr. Ward to dismiss the 2002 charge in exchange for Mr. Ward's cooperation in Petitioner's case. (RT at 91.) After noting that Mr. Ward was currently "in custody simply on this case" for failing to appear, the prosecutor informed the court that he wished to call Mr. Ward as a witness as soon as possible. (RT at 91.)
>
> After listening to both sides, the court ultimately decided that the parties would continue with their

opening statements as originally planned that morning. (RT at 92-93.) The court reminded the parties that no proceedings would be held that afternoon so that the judge could attend his mother's funeral. (RT at 93.) The court also directed the prosecutor to present other witnesses ahead of Mr. Ward until the "question of discovery" had been resolved. (RT at 93.)

In accordance with this decision, the prosecutor called his first witness to the stand the next morning on Tuesday, January 7, 2003. (CT at 544.) Throughout the remainder of the week, the prosecutor presented several more witnesses, while Mr. Ward remained in custody. (CT at 616-18.)

On Friday evening of January 10, 2003, outside the jury's presence, the prosecutor informed the court that he had "given counsel a good portion of the rap sheets on Mr. Ward," that "[t]here may be a few on Mr. Ward that I will have by Monday," and that he still wished "to proceed on Mr. Ward on Monday . . . ." (RT at 286.) The prosecutor explained that the older police reports from Contra Costa County were no longer available, but that he had provided defense counsel Warden with a copy of the police report for the 2002 dropped charge, as well as "at least two other reports pertaining to Mr. Ward." (RT at 286.)

Attorney Warden noted that, according to one of these reports, Mr. Ward was alleged to have pointed a gun at one person's head and to have fired it at someone else. (RT at 287.) When the court asked attorney Warden how this allegation was relevant to impeaching Mr. Ward in the current case, attorney Warden replied, "I just got this stuff." (RT at 287.) The court responded, *"So you can read over the weekend and come up with your basis and you can argue to me*; is that right?" (RT at 287 [emphasis added].) Attorney Warden replied, "Yeah." (RT at 287.)

On Monday morning, January 13, 2003, the prosecution continued presenting additional witnesses for his case-in-chief. (CT at 619.) After the lunch recess, the parties, along with Mr. Ward and his own attorney, appeared before the court, outside the jury's presence. (RT at 346.) After detailing the circumstances leading to Mr. Ward's arrest on a bench warrant for failing to appear as a witness in this case, Mr. Ward's defense counsel asked for his immediate release from custody.(RT at 346-50.) Attorney Warden objected, explaining that he feared Mr. Ward would run to avoid testifying in this trial, which would force the parties to rely upon Mr. Ward's preliminary hearing testimony, thereby preventing attorney Warden from impeaching Mr. Ward with any of the newly discovered police reports. (RT at 351.) Attorney Warden admitted that he had not yet "fully examined" the preliminary hearing transcript in light of "the new reports . . . ." (RT at 350-51.)

The court reminded attorney Warden that he "had this discovery since last week . . . at least by last Thursday," which gave attorney Warden and his investigator all of Friday, Saturday, and Sunday to complete any additional investigation that would yield impeachable evidence for Mr. Ward's prior convictions. (RT 351.) Attorney Warden responded that he had not yet provided the reports to his investigator because he had been *"out of town Friday, Saturday, and [he] got back Sunday."* (RT at 352 [emphasis added].)

The court responded,

> I appreciate you may well have been out of town, but the understanding—and I mean no disrespect. I have nothing but the highest regard, but your job is to be on the point on this case. That's your job, and if you had plans to go out of town and this came to you, you shouldn't have gone. [¶] You should have tried to resolve this, and I don't mean to be mean to you, but I'm telling you, again, I think you're nothing but highly qualified. You try a good case and you love your client.

(RT at 352.)  After counsel for Petitioner's co-defendant affirmed that he was ready to cross-examine Mr. Ward (RT at 352), the court decided to have Mr. Ward commence his testimony that afternoon, to defer attorney Warden's cross-examination of Mr. Ward until he was ready, and to release Mr. Ward from custody that evening. (RT at 352-55.) The court added that attorney Warden did not have an "unlimited duration" to "fish[ ] around" for admissible impeachment evidence against Mr. Ward. (RT at 352-53.) The court nevertheless indicated that, "if

you have not developed what you think you need to develop by today or, say, this week, [then] you can call [Ward] in your case" and "take him on as if in cross-examination." (RT at 355.)

In response, attorney Warden explained that he had reviewed the police reports over the weekend while out of town and that he had discovered two incidents that he wished to pursue further: the first involved a bottle Mr. Ward supposedly threw at someone, and the second involved a gun Mr. Ward supposedly pointed at someone's head while threatening to shoot. (RT at 355.) Attorney Warden suggested a hearing under California Evidence Code section 402 to ask MR. Ward about these incidents. (RT at 355.) The court reminded attorney Warden that, even if Mr. Ward admitted these offenses, they still did not appear to be admissible as impeachment evidence in this case. (RT at 356.)

That afternoon, the parties and Mr. Ward appeared before the court outside the jury's presence. (RT at 391.) At that time, the court suggested that any history of violence or use of a weapon by Mr. Ward might be relevant to a possible theory of self-defense. (RT at 392-93.) Attorney Warden replied that he had no information about the circumstances surrounding the petty theft conviction because those records had been destroyed pursuant to standard policy, he still did not know whether the Minnesota warrant for car theft had ever resulted in a conviction, he wanted to confirm that the single felony conviction had resulted in a prison sentence, and he requested the entire prosecution file for the dismissed assault charge to ensure that no deal had been made to Mr. Ward for his cooperation in Petitioner's case. (RT at 393-94.) As a result, the trial court permitted attorney Warden to question Mr. Ward about these events outside the jury's presence before Mr. Ward could appear as a witness at trial. (RT at 394-95.)

In that hearing, Mr. Ward acknowledged that he had a 1989 petty theft conviction, but he claimed that he could not recall the details because "me and my brothers have been mixed up quite a few different times . . . ." (RT at 395.) Mr. Ward confirmed that he had faced charges in Minnesota for the unauthorized use of a car, that a warrant had been issued when he failed to appear, and that he had ultimately received probation for this offense, but he could not recall whether it had been classified as a felony or misdemeanor. (RT at 395-97.) Mr. Ward denied that he had ever gone to prison, acknowledged that he had received a suspended sentence at some point, and admitted that he had been convicted of a felony for shooting at an inhabited vehicle, for which he served 365 days in jail. (RT at 397-398.) As for the dismissed assault charge, Mr. Ward explained that, "[i]n self defense with four guys jumping me in a fight, one of them got hit with a bottle." (RT at 401.) When asked whether Mr. Ward had admitted to a police officer that he had accused one of the men of hitting his mom and had personally thrown the bottle, the court sustained the prosecutor's objections.(RT at 401.) When attorney Warden complained that he had asked for a continuance to "bring these people in" for this investigation, the court replied, "I've indicated you can reserve your cross-examination and if need be, you need to work on Saturday, Sunday like I do." (RT at 401 (emphasis added).)

Thereafter, the jury was brought in and Mr. Ward commenced testifying for the prosecution. (RT at 402.) At the outset, Mr. Ward admitted he was presently in custody for failing to appear in court. (RT at 402.) The prosecutor continued his direct examination of Mr. Ward for the remainder of the day and concluded the next morning on January 14, 2003. (CT at 620, 622.) Attorney Warden, as well as counsel for Petitioner's co-defendant, also completed their cross-examination of Mr. Ward that same day. (CT at 622; RT at 457, 488-89, 513, 526, 533, 538-39.)

From Respondent's review of the record, none of the attorneys ever asked Mr. Ward about his criminal history in front of the jury, and none ever asked to recall Mr. Ward to question him further about this topic or any other. Instead, both defense attorneys focused upon favorable aspects of Mr. Ward's testimony, such as that Petitioner had apologized and shaken hands with Garnica after the verbal confrontation, Garnica was upset and carrying a tire iron during the physical confrontation, Petitioner was walking ten feet behind Medina when the first punch was thrown, Mr. Ward did not observe Petitioner actually hit Garnica, and Mr. Ward did not observe Baca at any time during the physical confrontation. (RT at 471-74, 488-89, 493, 498-511, 513, 536.) In fact, attorney Warden emphasized these same details in his closing argument to support his assertion of

1  Petitioner's innocence. (RT at 1049-78.)

2  Dkt. 13, at 51-55.

3      Petitioner's counsel was provided with Ward's criminal history before trial. Counsel examined

4  Ward on the stand before trial and explored the criminal history.  Petitioner has not shown that any further

5  investigation of Ward's criminal history would have assisted in obtaining relevant information.  Further,

6  while petitioner's counsel attempted to discredit a statement Ward gave to a police officer while Ward was

7  hospitalized shortly after the shooting, counsel elicited testimony from Mr. Ward at trial to support his

8  theory of the case that Garnica was looking to start a fight and that Medina or Garcia started the fight.

9  Petitioner's counsel attempted to bolster his case with Ward's testimony at trial.  Petitioner has not shown

10  that use of a felony conviction to discredit Mr. Ward's testimony at trial would have been helpful to his

11  theory of the case.

12      Accordingly, petitioner has not shown that his trial counsel's failure to investigate Mr. Ward's

13  criminal history was deficient, nor has he shown that any failure to investigate was prejudicial.

14  The California state court decisions upholding petitioner's conviction, after he raised this issue in his state

15  habeas corpus proceedings, were not contrary to or an unreasonable application of clearly established

16  federal law, as determined by the Supreme Court, nor did they result in a decision that was based on an

17  unreasonable determination of the facts in light of the evidence presented to the state courts. This claim is

18  without merit.

19      *Claim 11.*  Petitioner contends that his trial counsel was deficient for failing to impeach Lee Ward's

20  testimony with his prior felony conviction for a violation of Penal Code § 246 (Shooting at an inhabited

21  dwelling house, occupied building, vehicle, or aircraft, or inhabited housecar or camper).

22      As discussed above, petitioner has not shown that his trial counsel's failure to impeach Ward was

23  anything other than a tactical decision, nor has he shown that failure to impeach Ward was prejudicial. The

24  California state court decisions upholding petitioner's conviction, after he raised this issue in his state

25  habeas corpus proceedings, were not contrary to or an unreasonable application of clearly established

26  federal law, as determined by the Supreme Court, nor did they result in a decision that was based on an

27  unreasonable determination of the facts in light of the evidence presented to the state courts. This claim is

28  without merit.

    *Claim 12.*  Petitioner claims that his trial counsel was deficient for failing to present an expert

witness on gangs on behalf of the defense.

In rejecting this claim, the Sacramento County Superior Court concluded as follows:

> Petitioner states that he requested that trial counsel present a defense expert witness on gangs to rebut the prosecutor's gang expert. Petitioner claims that he was no longer a gang member at the time of the charged offenses. Petitioner has not shown that any expert witness could have testified that Petitioner was no longer a gang member. In particular, there is no evidence to support Petitioner's contention [sic] that he had not been a gang member for a year and a half prior to the murder, as alleged in the petition. At most, Petitioner's declaration states that he *told counsel* that he had not been gang affiliated, but the declaration does not specifically state that Petitioner was in fact not a gang member at the time of the offense or had not participated in any gang activities. Therefore, he has failed to show that any error by counsel in not calling a defense expert was prejudicial.

Dkt. 14, Lodged Document No. 10, at 3. *Emphasis in the original.*

Petitioner has not shown that any gang expert could or would have testified that petitioner was no longer a gang member. Further, petitioner has not shown what a gang expert would have testified to that would have assisted petitioner in countering Detective Aurich's testimony. Even assuming petitioner told his counsel that he was no longer a gang member and that he wanted his counsel to hire an expert witness to counter the gang expert presented by the prosecution, petitioner has not made a sufficient showing that counsel's failure to obtain and present a gang expert fell below an objective standard or reasonableness nor has petitioner shown prejudice resulting from his counsel's failure to do so.

The state court decisions rejecting petitioner's claim that his trial counsel was ineffective for failing to obtain and call a gang expert to testify on his behalf were not contrary to or an unreasonable application of clearly established federal law, as determined by the Supreme Court, nor did they result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. Petitioner's claim is without merit.

### 5. Ineffective Assistance of Appellate Counsel (Claim 5)

Petitioner contends that his appellate counsel was ineffective because he failed to raise two issues: (1) that there was insufficient evidence to support the gang allegation under Pen. Code § 186.22; and (2) that petitioner was denied his right to fair notice that the prosecution was relying on the crime of disturbing the peace for aiding and abetting the commission of second degree murder and attempted murder. The court has discussed the merits of these claims above and has determined that they are without merit. Accordingly, petitioner has not shown that his appellate counsel's failure to raise them on appeal fell below an objective standard of reasonableness and that the deficient performance affected the result of the

1   proceeding.

2         The California state court decisions upholding petitioner's convictions were not contrary to or an

3   unreasonable application of clearly established federal law, as determined by the Supreme Court, nor did

4   they result in a decision that was based on an unreasonable determination of the facts in light of the

5   evidence presented to the state courts. Petitioner's claim that his appellate counsel was ineffective is

6   without merit.

7                              EVIDENTIARY HEARING

8         If a habeas applicant has failed to develop the factual basis for a claim in state court, an evidentiary

9   hearing may not be held in federal court unless (A) the claim relies on (1) a new rule of constitutional law,

10  made retroactive to cases on collateral review by the Supreme Court that was previously unavailable, or

11  (2) a factual predicate that could not have been previously discovered through the exercise of due

12  diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing

13  evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty

14  of the underlying offense. 28 U.S.C. §2254(e)(2) (1996). Petitioner's claims rely on established rules of

15  constitutional law. Further, petitioner has not set forth any factual basis for his claims that could not have

16  been previously discovered by due diligence. Finally, the facts underlying petitioner's claims are insufficient

17  to establish that no rational factfinder would have found him guilty of the crime. Therefore, petitioner is

18  not entitled to an evidentiary hearing.

19                                  CONCLUSION

20        The state court decisions denying petitioner's claims for relief and upholding petitioner's

21  convictions were not contrary to or an unreasonable application of clearly established federal law, as

22  determined by the Supreme Court, nor did they result in a decision that was based on an unreasonable

23  determination of the facts in light of the evidence presented to the state courts. The petition for writ of

24  habeas corpus should be denied and the case dismissed with prejudice.

25                          CERTIFICATE OF APPEALABILITY

26        The district court should grant an application for a Certificate of Appealability only if the petitioner

27  makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). To obtain a

28  Certificate of Appealability under 28 U.S.C. § 2253(c), a habeas petitioner must make a showing that

    reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different

manner or that the issues presented were adequate to deserve encouragement to proceed further.  *Slack v. McDaniel*, 120 S.Ct. 1595, 1603-04 (2000) (*quoting Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).  When the court denies a claim on procedural grounds, the petitioner must show that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.  *Slack v. McDaniel*, 120 S.Ct. at 1604.

In the event that petitioner appeals the denial of his habeas corpus petition to the Ninth Circuit U.S. Court of Appeals, the court has determined that a Certificate of Appealability should be denied.  The court has reviewed all of the claim on the merits.  Petitioner has not shown that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.

Therefore, it is hereby

**ORDERED** that the petition for writ of habeas corpus is **DENIED**.  A Certificate of Appealability is **DENIED**.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

DATED this 23rd day of March, 2009.

ROBERT J. BRYAN
United States District Judge

Order - 33